IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| Carlo Felizmenio Gavino, Jr.,<br>    Plaintiff, | )<br>)<br>) |
| v. | )    1:14cv975 (TSE/IDD) |
| B. Queensberry, et al.,<br>    Defendants. | )<br>)<br>) |

## MEMORANDUM OPINION

Carlo Felizmenio Gavino, Jr., a Virginia inmate proceeding pro se, has filed a civil rights action, pursuant to 42 U.S.C. § 1983, alleging that defendants Lt. Bryan Queensberry and Sgt. Albert Vanderpool used excessive force against him, and that defendant Dorothy Hightower, R.N., showed deliberate indifference to his serious medical needs. Defendants have filed a Motion for Summary Judgment and a memorandum of law and affidavits to support their motion. Defendants also have provided plaintiff the notice required by Local Civil Rule 7(K) and Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975). Dkts. 53, 54. Plaintiff has submitted a response to the defendants' Motion. Dkt. 59.[1] Plaintiff has also filed a Request/Motion for Extension, in which he requests additional time to discover the addresses of defendants who have not yet been served. Dkt. 55. As the additional defendants are not necessary to adjudicate the merits of the case, plaintiff's Motion must be denied, and the additional defendants must be dismissed from this action. In addition, for the reasons that follow, the defendants' Motion for Summary Judgment must be granted.

---

[1] Plaintiff filed a Motion for Extension of Time to respond to the defendants' Motion. Dkt. 56. Because plaintiff then timely submitted his response, his Motion must be denied, as moot.

## I. Background

On August 1, 2012, plaintiff was released from segregation at Lawrenceville Correctional Center ("Lawrenceville") and returned to the general population. See Declaration by Carlo Felizmenio Gavino, Jr. ("Decl. 3") [Dkt. 3] ¶ 1.[2] When he arrived at his cell before the 5:30 p.m. count time, he realized that he did not have a mattress. Id. The building sergeant told plaintiff on multiple occasions that he would find a mattress for plaintiff. Id. ¶¶ 2-3. At 9:30 p.m., plaintiff was still waiting for a mattress. Id. ¶¶ 3-4. The sergeant told plaintiff to wait outside his cell while he went to look for a mattress, so plaintiff waited in the unit day room. Id. ¶¶ 6-7.

At this time, the correctional officers were beginning to change shifts. The control booth officer ordered plaintiff to return to his cell. Plaintiff "dismissed her," as he was waiting for the sergeant to return. Id. ¶ 8. Another officer also told plaintiff to return to his cell, but he continued to wait for the sergeant to return. Id. ¶ 9. When the sergeant did return, he did not have a mattress for plaintiff. Id. ¶ 10. "Out of frustration," plaintiff began to kick the door of the unit. Id. ¶ 11. The sergeant and other officers came into the unit, and plaintiff swore at the officers to leave him alone. Id. ¶ 12.

At approximately 10:15 p.m., an officer requested assistance in dealing with plaintiff. Defendant Queensberry responded as part of an emergency response team. See Defendants' Memorandum in Support of their Motion for Summary Judgment ("Defs.' Mem.") [Dkt. 54], Ex. B (Queensberry Aff.) ¶ 5. Queensberry gave plaintiff several orders to "cuff up" and to return to his cell.[3] Plaintiff refused each of these orders. Id. ¶ 7. Plaintiff evaded the officers' attempt to apprehend him and "began running around the pod." Id. ¶ 8. Queensberry and other officers

---

[2] In addition to his complaint, plaintiff submitted seven declarations describing the facts underlying his lawsuit. These declarations are docketed as entries 3 through 9. For simplicity, each will be cited as "Decl. [docket entry]."

[3] According to Queensberry, to "cuff up" means to submit to handcuffs.

2

eventually succeeded in bringing plaintiff to the ground and placing him in handcuffs. Id.

As the officers were attempting to apprehend him, plaintiff "was enveloped by extreme duress," and attempted to avoid apprehension. Decl. 3 ¶ 17. As he was being handcuffed, plaintiff noticed that Queensberry was holding his right arm and twisting his wrist. Id. ¶ 18. In response, plaintiff "bent forward at [his] waist and pulled [his] arms in toward [his] body while moving in reverse." Id. ¶ 19. He also "launched a panicked flurry of strikes to [his] left side," without any thought to who or what he might hit. Id. ¶¶ 21-22. Once plaintiff was on the floor and in a headlock, he "stopped struggling." Id. ¶¶ 23, 26. He then alleges that Queensberry pulled his right arm out perpendicular to his body and began to twist it until it snapped. Id. ¶¶ 25-26.

Once plaintiff had been handcuffed, correctional officers brought him to the medical department. On the way to medical, plaintiff repeatedly attempted to sit down, and eventually had to be carried. Defs.' Mem., Ex. B ¶ 10; Decl. 3 ¶¶ 30-31. Upon reaching medical, officers "dropped [him] face down on the examination table and put ankle shackles on [him]." Decl. 3 ¶ 32. Vanderpool allegedly placed the ankle shackles on plaintiff, and told him that he "[didn't] care if they're on right or not." Id. Nurse Segura then conducted a pre-segregation examination and treated several scratches and cuts. Id. ¶ 34. Plaintiff told Segura that he believed that his arm might be fractured because "numerous people fell on him." Defs.' Mem., Ex. H (Hightower Aff.) ¶ 8. Segura examined his arm, observed no visible injuries, and concluded that he was likely suffering from tissue damage. Decl. 3 ¶ 34; Defs.' Mem., Ex. I, at unnumbered page 10. Plaintiff declined to have Segura check his vital signs or to conduct a full pre-segregation evaluation. Decl. 3 ¶ 34; Defs. Mem., Ex. H ¶ 8.

When he arrived in segregation that night, plaintiff began to experience severe pain in his

3

arm. His arm "was noticeably swollen," and he experienced a "rapid twitching feeling . . . that hurt badly." Decl. 3 ¶ 37. His arm would then "contract hard" and "straighten involuntarily." He states that "it felt as if something was squeezing from all sides." Id. Plaintiff suffered from this pain all night and was unable to stand, sit, or lay down for any significant period of time. Id. The next morning, plaintiff submitted a request to see medical, but he was not contacted for several days. Id. ¶ 38. During these several days, plaintiff made himself a "makeshift sling" out of some ripped sheets and informed his family of the situation. Id. ¶ 39.

On August 6, 2012, plaintiff returned to medical and was examined by Nurse Jenkins. Defs. Mem., Ex. H ¶ 9. Jenkins examined plaintiff's arm and observed bruising. She did not observe any swelling, however, and found that plaintiff had full range of motion. Id. She prescribed 800 mg of Motrin for a period of five days, instructed plaintiff to keep his arm elevated and to periodically apply a warm compress. Id. Jenkins also told plaintiff to return to medical if the problem continued. Id.

Plaintiff states that Segura called him back to medical on August 8, 2012. Decl. 3 ¶ 41. There are no medical records documenting this visit, however. See, e.g., Defs.' Mem., Ex. H ¶ 10. Plaintiff states that, on this occasion, Segura informed him that plaintiff's father had repeatedly called requesting that plaintiff be examined by a doctor. Decl. 3 ¶ 41. Dr. Moreno allegedly examined plaintiff, noticed that his right arm was swollen, and told plaintiff that he was likely experiencing pain from tissue damage. Id. Moreno then told plaintiff that "he was going to go ahead and order [plaintiff] an x-ray anyway." The x-ray was allegedly scheduled for August 14, 2012. Id.

Medical records indicate that Dr. Moreno and Nurse Hightower examined plaintiff on August 15, 2012. Defs.' Mem., Ex. H ¶ 10. Plaintiff told Moreno and Hightower that he no

4

longer believed that his arm was broken, but that he was still suffering from "mild to moderate pain" in his right arm and elbow. Id. Upon examination, Moreno found that plaintiff had normal strength and range of motion in his right arm; neither Hightower nor Moreno believed that plaintiff's arm was fractured. Id. Nevertheless, Moreno submitted an x-ray request and extended plaintiffs' Motrin prescription for an additional 30 days. Id. Plaintiff's x-ray was scheduled for August 21, 2012. Id. ¶ 11; Decl. 3 ¶ 44. Plaintiff was released from segregation on August 23, 2012. Decl. 3 ¶ 46.

Due to an unknown scheduling conflict, plaintiff did not receive an x-ray until August 27, 2012. Defs.' Mem., Ex. H ¶ 11; Decl. 3 ¶ 48. The x-ray revealed that plaintiff's right arm was fractured. Defs.' Mem., Ex. H ¶ 11. The next day, Moreno scheduled an appointment for plaintiff to meet with an outside orthopedist. Defs.' Mem, Ex. H ¶ 12. Plaintiff visited the orthopedist on August 29, 2012. The orthopedist told plaintiff that "not much could be done for [him] because with the amount of time that had already passed the bone had already begun healing." Decl. 3 ¶ 50. The orthopedist also provided plaintiff with a sling. Id. ¶ 51. Upon his return to Lawrenceville, plaintiff declined to receive additional pain medication. Defs.' Mem., Ex. H ¶ 13.

On October 22, 2012, Moreno ordered follow-up x-rays. Id. ¶ 14. Plaintiff received a follow-up x-ray on November 14, 2012, and returned to the orthopedist on December 4, 2012. Id. ¶ 15. The orthopedist informed plaintiff that his arm was healing well and permitted him to participate in all general activities. Decl. 3 ¶ 54. Moreno examined plaintiff again on December 7, 2012, and noted that his arm had healed. Defs.' Mem., Ex. H ¶ 15. Plaintiff states, however, that although his right arm is "fully functional," he suffers from "tingling, aching, and throbbing sensations which at times can be painful." Decl. 3 ¶ 55. Plaintiff also states that his arm "either

5

feels rigid or unstable," and he believes that he has suffered nerve damage at the location of the break. Id.

Hightower, the only remaining medical defendant in this action, played no direct role in plaintiff's medical treatment other than providing assistance to Moreno in his examination of plaintiff on August 15, 2012. Defs.' Mem., Ex. H ¶ 22. On August 21, 2012, however, she responded to plaintiff's August 1, 2012 informal complaint, in which he asserted that his arm was broken and required an x-ray. Id. ¶ 17. Plaintiff then filed an informal complaint against Hightower on August 26, 2012, asserting that she had lied in her response to his original informal complaint. Id. ¶ 18. Plaintiff filed another informal complaint on the same day, asserting that Hightower lied to his father about the status of plaintiff's x-ray. Id. ¶ 19. Hightower spoke with plaintiff's father on approximately August 22, 2012. On that day, it appeared as if plaintiff had received an x-ray on August 21, 2012, as his name had been on the schedule for that day. At the time, Hightower did not have sufficient information to confirm whether plaintiff had actually received the x-ray on that day. Id.

Plaintiff filed the instant action on July 30, 2014, alleging that Queensberry, Vanderpool, and other correctional officers used excessive force on the night of August 1, 2012; and that Hightower and other medical officials showed deliberate indifference to his serious medical needs.

## II. Standard of Review

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. The moving party bears the burden of proving that judgment as a matter of law is appropriate. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). To meet

that burden, the moving party must demonstrate that no genuine issues of material fact are present for resolution. Id. at 322. Once a moving party has met its burden to show that it is entitled to judgment as a matter of law, the burden shifts to the nonmoving party to point out the specific facts that create disputed factual issues. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The nonmoving party must present some evidence, other than its initial pleadings, to show that there is more than just a "metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); see also Celotex, 477 U.S. at 324 (quoting Rule 56(e) ("Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by [other evidence] designate 'specific facts showing that there is a genuine issue for trial.'"). In evaluating a motion for summary judgment, a district court should consider the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences from those facts in favor of that party. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).

Those facts which the moving party bears the burden of proving are facts which are material. "[T]he substantive law will identify which facts are material. Only disputes over facts which might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248. An issue of material fact is genuine when, "the evidence . . . create[s] [a] fair doubt; wholly speculative assertions will not suffice." Ross v. Commc'ns Satellite Corp., 759 F.2d 355, 364 (4th Cir. 1985), abrogated on other grounds by Price Waterhouse v. Hopkins, 490 U.S. 228 (1989). Therefore, summary judgment is appropriate only where no material facts are genuinely disputed and the evidence as a whole could not lead a rational fact finder to rule for the nonmoving party. Matsushita Elec. Indus. Co., 475 U.S. at 587.

### III. Analysis

Summary judgment in favor of the defendants is appropriate because the pleadings, affidavits, and exhibits on file demonstrate that he did not use excessive force against plaintiff. To the extent that any disputes of fact exist, these disputes are not material, and do not preclude the entry of summary judgment in favor of the defendants.

### A. Exhaustion

Section 42 U.S.C. § 1997e(a) requires inmates to exhaust all administrative remedies before filing a § 1983 action. Exhaustion of administrative remedies is no longer left to the discretion of the district court and is mandatory, even if the exhaustion process cannot provide prisoner with the relief he seeks. See, e.g., Booth v. Churner, 532 U.S. 731, 741 (2001); Woodford v. Ngo, 548 U.S. 81, 86 (2006). The U.S. Supreme Court has explicitly stated that "the [§ 1997e(a)] exhaustion requirement requires proper exhaustion." Woodford, 548 U.S. at 93. "Proper" exhaustion requires "'using all the steps that the agency holds out and doing so . . . so that the agency addresses the issues on the merits.'" Id. at 90 (quoting Pozo v. McCaughtry, 286 F.3d 1022, 1024 (7th Cir. 2002), cert. denied, 537 U.S. 949 (2002)). In order to properly exhaust remedies, therefore, an inmate must fully comply with the prison's grievance procedures, and give the prison "a fair opportunity to consider the grievance." Id. at 95. Thus, a prisoner must follow all procedural rules of the grievance procedure.

Virginia Department of Corrections ("VDOC") Operating Procedure 866.1 provides the required steps that an inmate must pursue to exhaust administrative remedies. An inmate must first attempt to resolve any issues informally. See VDOC Op. Proc. 866.1(V)(B). Prison officials must respond to the inmate's complaint within fifteen days of receiving an informal complaint. See id. (V)(C). After seeking informal resolution, an inmate may file a regular

grievance to the warden or superintendent. The grievance must be filed within thirty days of the underlying incident or occurrence, except in circumstances beyond an inmate's control, or in a situation involving alleged sexual abuse. See id. (VI)(A)(1). Depending on the subject of the grievance, up to two additional levels of review by higher authorities within VDOC may be available following the filing of a regular grievance. See id. (VI)(C).

The evidence shows that plaintiff did not fully exhaust his remedies before filing this action. On August 26, 2012, plaintiff filed an informal complaint against Vanderpool. See Plaintiff's Exhaustion Affidavit ("Exh. Aff.") [Dkt. 15], Att., at unnumbered page 14. After receiving a response on September 4, 2012, plaintiff filed a regular grievance on September 17, 2012. Id. at unnumbered pages 14-15. This grievance was rejected as untimely, and the decision was upheld by the Regional Ombudsman. Id. at unnumbered page 16. Similarly, on September 17, 2012, plaintiff filed an informal complaint against Queensberry. See id. at unnumbered page 33. After receiving a response on September 20, 2012, he filed a regular grievance on September 28, 2012. See id. at unnumbered pages 33-34. This grievance was rejected as untimely, and this decision was again upheld by the Regional Ombudsman. Id. at unnumbered page 35.

On August 26, 2012, plaintiff filed an informal complaint against Hightower, asserting that she lied in her response to his August 21, 2012 complaint. Id. at unnumbered page 19. After she responded to this grievance, he filed a regular grievance on September 22, 2012. Id. at unnumbered pages 19-20. Because plaintiff did not provide a date of occurrence on this grievance, the grievance coordinator rejected the grievance. This decision was also upheld by the Regional Ombudsman. Id. at unnumbered page 21. Plaintiff filed an additional informal complaint against Hightower on August 26, alleging that she "attempted to mislead" his family about his x-ray when she spoke with his father on the phone. Id. at unnumbered page 23. After

9

Hightower responded, plaintiff filed a regular grievance on September 22, 2012. Id. at unnumbered page 23-24. This grievance was rejected as untimely, and the Regional Ombudsman upheld this decision. Id. at unnumbered page 24.

Because plaintiff's grievances were not properly filed, VDOC officials did not have a chance to review the merits of his claims. He therefore did not properly exhaust his administrative remedies on his claims against Queensberry, Vanderpool, and Hightower, these claims must be dismissed.[4] See Woodford, 548 U.S. at 86.

### B. Deliberate Indifference

Plaintiff's sole exhausted claim in this action is his contention that the Lawrenceville medical staff committed "malpractice" in the treatment of his fractured arm. See, e.g., Exh. Aff., at unnumbered pages 28-32. At present, there is no defendant in the lawsuit who can be responsible for the harm alleged. Plaintiff has made several attempts to effectuate service on Dr. Moreno; however, plaintiff's attempt to serve Moreno and add him as a defendant in this action is futile, as it is clear from the attached exhibits that neither Moreno nor any other member of the Lawrenceville medical staff violated plaintiff's Eighth Amendment rights.

#### *1. Eighth Amendment Standard*

To prevail on a claim of deliberate indifference to serious medical needs, a plaintiff "must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Estelle v. Gamble, 429 U.S. 97, 105 (1976); see also Staples v. Va. Dep't of Corr., 904 F. Supp. 487, 492 (E.D. Va. 1995). Thus, a plaintiff must satisfy two distinct elements to show that he is entitled to relief. First, he must provide evidence to show that he suffered from a sufficiently serious medical need. A medical need is "serious" if it has been diagnosed by a physician as

---

[4] As plaintiff's allegations against Correctional Officer Moore are also unexhausted, plaintiff's request to effectuate service on defendant Moore must also be denied.

10

mandating medical treatment, or if a lay person would recognize the need for medical treatment. See Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008) (quoting Henderson v. Sheahan, 196 F.3d 839, 846 (7th Cir. 1999)); see also Cooper v. Dyke, 814 F.2d 941, 945-46 (4th Cir. 1987) (determining that intense pain from an untreated bullet wound is sufficiently serious); Brown v. District of Columbia, 514 F.3d 1279, 1284 (D.C. Cir. 2008) (concluding that the "intense and often relentless pain" associated with untreated gallstones is sufficiently serious); but see Hall v. Holsmith, 340 F. App'x. 944, 947 & n.3 (4th Cir. 2009) (holding that flu-like symptoms did not constitute a serious medical need).

Second, a plaintiff must show that the defendants acted with deliberate indifference to his serious medical need. To act with deliberate indifference, a defendant "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer v. Brennan, 511 U.S. 825, 837 (1994). An assertion of mere negligence or malpractice is not enough to state a constitutional violation; instead, plaintiff must allege and demonstrate "[d]eliberate indifference . . . by either actual intent or reckless disregard." Miltier v. Beorn, 896 F.2d 848, 851 (4th Cir. 1990), overruled in part by Farmer, 511 U.S. 825; see also Estelle, 429 U.S. at 106. In other words, a plaintiff must show that defendant's actions were "[s]o grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." Miltier, 896 F.2d at 851 (citations omitted). To act with deliberate indifference, a defendant must have actual knowledge of the potential risk of harm to an inmate; the mere fact that the defendant should have known of the risk is not sufficient to constitute deliberate indifference. See, e.g., Young v. City of Mt. Ranier, 238 F.3d 567, 575-76 (4th Cir. 2001); Grayson v. Peed, 195 F.3d 692, 695 (4th Cir. 1999) ("Deliberate indifference is a very high standard – a showing of mere negligence will not meet it.").

11

## *2. Analysis*

From August 1 through August 27, 2012, no less than three members of the Lawrenceville medical staff believed that plaintiff suffered only from tissue damage in his right arm. Based on this information, the medical staff did not believe that plaintiff was suffering from any serious medical need that required additional treatment. Such a decision does not constitute deliberate indifference. To act with deliberate indifference, medical providers must "actually ... recognize[] that [their] actions [are] insufficient" to protect plaintiff from a known risk of harm. Parrish ex rel. Lee v. Cleveland, 372 F.3d 294, 303 (4th Cir. 2004) (citing Brown v. Harris, 240 F.3d 383, 390-91 (4th Cir. 2001)). The fact that the medical staff incorrectly diagnosed plaintiff's arm does not, standing alone, render their actions deliberately indifferent. While such treatment may have been negligent, or – to use plaintiff's own words, malpractice – negligent medical treatment does not violate the Eighth Amendment. See Grayson, 195 F.3d at 695 ("Deliberate indifference is a very high standard – a showing of mere negligence will not meet it.").

It is also clear that medical staff adjusted their treatment as necessary to respond to their evolving understanding of the nature of plaintiff's injury. On August 6, Segura prescribed Motrin to plaintiff to manage his pain. Moreno further extended plaintiff's prescription on August 15, in response to plaintiff's complaints of continued pain. These decisions were reasonable based on the providers' medical judgment of the extent of plaintiff's injuries. See, e.g., Snipes v. DeTella, 95 F.3d 586, 592 (7th Cir. 1996) ("Whether and how pain associated with medical treatment should be mitigated is for doctors to decide free from judicial interference, except in the most extreme situations."). Further, Moreno ordered x-rays for plaintiff in response to plaintiff's request, and, after discovering that plaintiff actually had fractured his arm, immediately sent plaintiff to an outside specialist. Rather than deliberate indifference, such actions show an

evolving response to plaintiff's needs and an effort to provide him with the most effective treatment under the circumstances. Accordingly, it is clear that none of the medical staff acted with deliberate indifference to plaintiff's serious medical needs. Therefore, plaintiff's motion to attempt service on Dr. Moreno must be denied.[5]

In this regard, it is important to note that, although the record does not reflect deliberate indifference on the part of Lawrenceville medical staff, it does reflect a lack of reasonable care. The VDOC needs to ensure that, in the future, its inmates receive reasonable, non-negligent medical care.

## IV. Conclusion

For the foregoing reasons, defendants' Motion for Summary Judgment will be granted. An appropriate Judgment and Order shall issue.

Entered this 10th day of June 2015.

Alexandria, Virginia

/s/ T. S. Ellis, III
T. S. Ellis, III
United States District Judge

---

[5] This conclusion also mandates dismissal of the claims against Nurse Jenkins.

13